I think we're ready. Good morning, I place the court. The main issue in this case is obviousness. There's a single independent claim that was presented as amended in the re-examination preceding the appeal and a single prior reference that's still in the record which is Bowery 188. Virun's position is that the Patent Office has failed to make a strong prima facie case of obviousness showing primarily on the basis that the single prior reference Bowery 188 does not teach the combination of features defined in Claim 1 as amended. Well, it includes a reference to TPDS, right, as a solubilized, whatever, agent. Right. It does. Okay. So why is that not enough? Well, Virun's position is that the reference, the single prior reference has a very broad chemical formula that covers many thousands of different possible compounds. The reference repeatedly suggests PTS, a different solubilizing agent, as the main, I would say, lead solubilizing agent of the reference. But it also calls out that TPDS, right? And the only way that it calls it out is to exclude it. And Virun's position is that this cannot be a motivation to select it. And there's no other evidence in the record that suggests a basis for substantially modifying PTS, which is chemically different. Well, but it's well known in the art that TPDS eliminates turbicity. But there was no evidence of any motivation in the record. But that's what, I mean, that's what the invention's all about. You're trying to get a liquid to go from a state where it's misty or obscure to where it's clear. And this compound, TPDS, is known in the art to produce that effect. And like I said, even with this knowledge, there wasn't, so even with this knowledge, there wasn't anything in the record suggesting to modify the Bowery 188 composition to significantly chemically change PTS, to use TPDS instead. But we're the ones with skill in the art who look at this and say, well, I think I'm going to try TPDS and see what it does. Well, and there's other evidence in the art that suggests that TPDS, even by Bowery himself, was considered to be toxic. And I think if you could... Well, there's not a teaching away here, is there? You're not arguing that there was a teaching away? We're not saying that it's a teaching away, but we're saying the only reference to TPDS and the only prior art reference is not to use it. Doesn't our case law, though, Bristol Myers and other cases, talk about the difference in degree is not enough, there has to be a difference in kind? And this seems to me your argument is that, okay, people didn't necessarily know exactly how well TPDS worked, but that's a difference in kind for something that existed and was known in the prior art. So how does that get you above the hurdle you need to get over? I'm sorry? How does that get you over the hurdle? Yeah, so I think that we provided a lengthy discussion of the case law in the briefs. I think that... I don't think that there is a bar to patentability based on unexpected results degree where the degree is significant. And I think here, if you read the inventor's two declarations and you study the data that's presented in the two tables, you will find that the results are significantly different in terms of the clarity of the results. Well, there's a problem with those declarations, is there not? Or at least the board thought there was a problem because they spoke to dilutions and not to concentrates, right? Well, and again, I think that our position as presented in the briefs is that I think the criticism is unfair. I think that you can look at the properties of a composition, for example, a drug composition that is administered to a human subject and to evaluate the properties of that composition when administered. That would not be evidence to not be considered just because it wasn't claimed that way in the body. You say that the difference in degree was significant, but the board found that it wasn't anything more than what could have been expected under routine experimentation. In that situation, the board looks to see if there's a difference in kind, and there was no difference in kind here. I think that the patent office's decision unfairly dismisses the substantial nature of the differences in the turbidity that was measured. And that's a question of substantial evidence. We review that for substantial evidence. Right. And I think that if you look at the declarations and the detail that the inventor provided, it's pretty clear that he went out of his way to explain all of the different steps that he took in testing the different compositions of the prior art reference, how they were diluted, why that's a fair way to evaluate turbidity of the concentrates. Speaking of clarity, as I was going to say previously, speaking of the briefs, you argue at 33 that the clarity of the concentrate is directly proportional to the clarity of the dilution. And you say the law of dilution is like any other established scientific principle of which judicial notice should be taken. You don't cite any evidence to support the proposition, or at least I couldn't find any in the record, that the clarity is directly proportional. And, of course, lawyer argument and speculation don't equate to evidence. Right. And here, I guess I would say we're relying on the inventor, who is an expert in this field. He had, at the time of his declarations, more than a decade of experience as a career chemist, multiple inventions in the field that are in patents, and I think he said some 30 patents and patent applications. We did cite to the Beer-Lambert Law. I don't think, on the other hand, that the Patent Office has raised a technical basis to challenge the validity of the scientific approach used by the inventor. It seems to be, to Viren and to us, an unfair criticism of an inventor who went to great lengths. So are you conceding that we can't take judicial notice? No, no. But I think that... Well, what in the record suggests that the purported scientific principle of which you're asking us to take judicial notice is of universal notoriety or generally known within our jurisdictions such that judicial notice is appropriate? I'm quoting, of course. Right. I think it's fair to take judicial notice of the existence of the Beer-Lambert principle, which is a well-known principle. I don't think that was the question. The question was, what in the record? I guess just the reference to Beer-Lambert and that formula, which is a well-known formula. So I would say, as we have stated in the briefs, we don't find that there was a very strong case of obviousness to begin with. The only mention of TPGS is to exclude it. There's nothing else in the record that the Patent Office combines with the single prior reference to make a case of obviousness. Even with that weak case, the inventor went to great lengths to provide direct comparisons with the closest prior art, PTS compositions. I think when you study the data that's provided in the tables, it's impressive. And the differences are significant. And as the inventor stated repeatedly in the declaration, it's unexpected. And I think the fact that an anonymous competitor attacked the patent is also something relevant. Competitors are eager to enter this field. This is a big business worldwide. And the ability to get these non-polar active ingredients into sports drinks and other beverages in a way that is acceptable to the consumer is a big invention. Why don't we hear from the government? May it please the court. I'd like to begin by addressing the prima facie case and then I'll discuss the unexpected results evidence. So with respect to the prima facie case, the board properly found that the examiner had established a strong prima facie. Is this your view when we look at secondary considerations? We're looking at a two-step process that first you must establish a prima facie case and only then do the secondary considerations come into play? Well, that's certainly what the examiner does. The examiner has to establish, has the requirement to establish a prima facie case and then the What's the government's position on that? What the government's position here is that the examiner did and No, no, not what happened in the case. What's your position with respect to that process? Do we look at a two-step process? I think I mean secondary considerations only come into play if you establish, if you make a prima facie case of obviousness? That's the way it works before the examiner. The examiner first has to establish a prima facie case and then the applicant can come back in with rebuttal evidence of secondary considerations. Of course, once it gets to the board and the board is looking at all of it together essentially as is this court. And no determination is made on the final conclusion of obviousness before you look at the secondary considerations. Correct. So if I may, I'd like to discuss the prima facie case and I think that there is evidence of a strong prima facie case. And that is in Borowski, which the examiner cites two. And the first finding by the examiner is that Formula 4, which is depicted on 1520 of the record, encompasses TPGS. I'm sorry to interrupt, but yeah, but that fact by itself doesn't help you that much, right? I mean, how many agents are included in Formula 4? Like, gazillions, right? Let me explain. If you look to 1520, it's actually quite a simple formula. It's a Y, an L, and a Z. Y is a hydrophilic region. L is the linker. Z is a hydrophobic region. And that's what allows it to bridge between the polar solvent, which of course the hydrophilic region would mix with the solvent. And the hydrophobic region would basically mix with the active ingredient and allow it to sort of encapsulate the active ingredient and mix and then dissolve into the solvent. What is depicted and described here in 1520 is they recommend as the hydrophobic moiety or component, tosopherol. They recommend for the hydrophilic region, PEG, polyethylene glycol. So in paragraph 74, they talk about tosopherol and recommend that as the hydrophobic. In paragraph 75, they talk about PEG as the hydrophilic. Those are the two components of both PTS and TPGS. So it's directing you basically to those two components. Then the next remaining part of it is the linker. And if you go to the next paragraph, 76, it talks about basically any kind of length of carbon chain, including C4 or C10, C4 being what is present in TPGS and C10 being what is present in PTS. So that is really giving you a roadmap and directing you to those surfactants. In addition, there is the alternative embodiment, which is at 146, which excludes or says where the surfactant is not TPGS. That strongly implies that in other embodiments, it would be TPGS. And moreover, the final finding by the examiner is in the examiner's answer in several places, but most notably at 10, I believe it's at 1199 of the record, the examiner says that TPGS is a well-known, if not one of the most well-known solubilizing agents. And it cites as evidence of that Eastman and the AP6 patent. And that has actually never been disputed by VIRIN, that it is a well-known solubilizing agent. So with the combination of all that evidence, I would submit it's almost close to an anticipation case, but certainly a very, very strong obviousness case. When you respond to your opponent that points out that in Borowski and the AP6 patent, that there's an expression of concern that TPGS is toxic, that certainly would seem to me to kind of get a person a skill in R to not consider that, waste their time to consider that if the result's going to be toxic. Well, I'm not quite sure how they're trying to use that piece of information. It's not something that's taught in Borowski, and this is an obviousness rejection based on Borowski, and there's nothing in Borowski that teaches away from it. And even then, when you look at the AP6 patent, the language is actually not really strong. Was there some argument before the examiner on teaching away? Only to the extent that they said that in paragraph 146, that paragraph 146, because it excludes TPGS, is somewhat of a teaching away, but no. But not on toxicity? Not on toxicity. That came up later. Now, if I may, I'd like to turn to the unexpected results evidence. And with respect to that, the board made several findings which I think were quite proper. First, the board found that the evidence was not commensurate with what is claimed. And that is because what is claimed is a composition comprising three different components in particular amounts. There is the surfactant, which is at 16 to 30 percent. There's a polar solvent that's in 60 to 79 percent. And then there's the active ingredient that is 5 to 10 percent. The unexpected results evidence was done with a different composition, where they actually added in eight times more water, which is a polar solvent. So in effect, what you have and what the secondary consideration evidence was with was a completely different composition that had different amounts, closer to 99.9 percent of a polar solvent and appreciably less of both the surfactant and the active ingredient, something less than 1 percent. So the board properly said, found that the unexpected results evidence was not, there was no nexus between that and between the claimed. And moreover, they did not provide any evidence to show that similar results would be achieved with the concentrated or what is claimed, the compositions that are claimed. Secondarily, the board found that even if they were to accept this and consider it to be, there to be a nexus and accept the evidence, there was additional problems with it, and that is, as Judge Prost indicated, this is more evidence of a difference in degree of a known and expected property. Everyone based on Borowski knew turbidity and clarity were properties, desirable properties, not a difference in kind of a new property. But our case law does kind of open the door. If it's enough of a difference in degree, then maybe it's enough. It does kind of open the door, but I don't think this, again, is still that kind of a case because as the examiner found in the second advisory action, I'm sorry, the first advisory action, which was after the 623 of the record, and that's after the second declaration was brought in by Bromley. What the examiner noted was that the values, the kind of values that were submitted in this declaration were not appreciably different. In fact, there were actually lower values obtained by Borowski in Figure 2 with PTS. So to the extent that they're showing this spectacular supposedly results with TPGS as compared to PTS, he said Borowski actually achieves comparable values and notably also says that there are comparable, both in the declaration evidence and in Borowski, they're usually in comparable ratio of the active ingredient and the surfactant. In addition, I will point the court to the examiner's answer at where it reproduces part of Borowski, and that's paragraph 30 of Borowski, so that's 1179 of the examiner's answer, and it reproduces Borowski paragraph 30, wherein it defines essentially clear to when the turbidity is not more than about 500% higher. Again, suggesting that the kinds of values and differences in values are not really that significant and even perhaps both would fall within what's considered to be essentially clear. Finally, as the board found, this was all well within routine experimentation, and I want to address the Beer-Lambert Law, which was only raised in the reply brief before this court. So first off, the issue with the Beer-Lambert Law is that it was not before the examiner or the board. It's effectively an argument that was waived, but I will address it because I think it's important. If you look into any chemistry textbook, you'll find that Beer-Lambert might hold up at very low concentration ranges, but here we're talking about a concentrate, and when you have a more concentrated solution, Beer-Lambert sort of falls apart because there are intermolecular actions between the molecules, and here it's simply not useful in terms of comparing the concentrates then to the dilutions. And significantly also in the examiner's answer at 1178, this is not another reason why Beer-Lambert is not likely to be applicable here. This is more complicated. It's not like a simple sugar solution. Here we're talking about a different kind of a solution where you're forming these micelles. And 1178 to 79 of the record, Borowski talks about the fact that first of all, there's a critical micelle concentration. In other words, there's a particular concentration for each surfactant, and until you reach that concentration, you're not going to get micelle formation. Further, it talks about if the micelles are too big, you'll start to get turbidity problems. So obviously, one of skill in the art with this would know that there is a range of the solvent that you have to use where you're going to have enough surfactant to get micelle formation but not too high that you start to get aggregates or large types of micelles that would cause turbidity. And that was well within the skill of the art, and simply Beer-Lambert does not change that. So I think the board's findings were simply completely defensible, that this was well within what one of skill in the art would be able to obtain. These values submitted in the declarations were the kind of results that one would expect from routine optimization. And in fact, that is kind of the problem with them taking one slice at a particular dilution. Obviously, for each surfactant, you would have to modify the amount of solvent to achieve the optimum clarity and turbidity, and one of skill in the art would know that. And therefore, in light of the strong prima facie case of obviousness, the secondary consideration evidence simply is insignificant to outweigh that. And therefore, I ask that this court affirm the board. Thank you. Just a few quick points to close it out. I continue to have trouble understanding how the patent office can say it's a very strong case of prima facie obviousness when the reference identifies only CBIS-8 solubilizing agents when TPGS is a 6N8. The only reference to TPGS is that it be excluded, and that there's not a single working example in the only prior art reference of a composition including TPGS. It seems hard for me to understand. On the subject of criticism of TPGS, I mean, the very inventor of the only prior art reference of record specifically states that TPGS is toxic. You did make this argument before the board, did you? Pardon? Did you make this argument? Was this argument made before the board? The toxicity argument? I don't recall. I don't recall, so it was part of the reexamination. The government is saying you waived it. You don't recall, so I don't see it in the record. Pardon? I don't see it in the record that this argument was made below. I know it's part of our briefs. It's part of your brief, but it's too late to bring it in your brief if you didn't make the argument below it before the board. Well, I think 826 was part of the record from the beginning. So, as I was saying, example 14 basically calls out TPGS as the only solubilizing agent in that reference that was considered toxic and to be looked at with caution. So, it's hardly a motivation to change from the PTS solubilizing agents as the only prior art reference in this record. On the comments that counsel for the patent office made criticizing Beer-Lambert, this is the first time we've heard any comment about it at all. So, I don't think it's fair to... Well, I think that didn't they explain it's because you raised it for the first time in your review? Well, but it wasn't part of the record. Right, so how were they to respond before you raised it? If you only raised it in your reply brief, this is their only opportunity to respond. Well, some technical basis for a reference or something that criticizes the applicability of Beer-Lambert I think would be more persuasive than just an attorney argument. So, in closing I guess I would just say Viren's position is there's not a strong prima facie case of obviousness. It's in fact totally deficient. The evidence of unexpected results is compelling. The inventor went to great lengths to describe the testing that was done. He tried to show that the dilutions were made consistently and that this is a sound scientific basis for measuring turbidity. I think it would be a dangerous precedent in the field of chemical patents to say that evidence like this is not sufficient to show patentability. But on the question of whether you even need to get to it, I don't think there's really a prima facie case of obviousness to begin with. But even if there was, the evidence here is quite compelling. And I would say if you consider this kind of evidence in the context of other inventions, these are the kinds of things that should be found patentable. If the inventor here had found this specific combination provided a substantially more effective treatment of cancer for Alzheimer's or HIV, these are the things that should be patentable. Thank you. Thank you. We thank both parties and the case is submitted.